**Joseph V. CURRAN, Plaintiff,**

v.

**Frank G. COUSINS, Jr., individually and in his official capacity as Essex County Sheriff; Thomas C. Goff, individually and in his official capacity as Essex County Special Sheriff, and the Essex County Sheriff's Department, Defendants.**

Civil Action No. 06–10562–RCL.

United States District Court,
D. Massachusetts.

March 30, 2007.

Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Lori A. Jodoin, Davis, Malm & D'Agostine, P.C., Boston, MA, for Plaintiff.

Geoffrey P. Wermuth, Murphy, Hesse, Toomey & Lehane, LLP, Boston, MA, for Defendants.

***MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANTS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS***

LINDSAY, District Judge.

### I. Introduction

Before the court are cross-motions for judgment on the pleadings under Fed. R.Civ.P. 12(c) filed by the plaintiff, Joseph V. Curran ("the plaintiff" or "Curran"),

and Frank G. Cousins, Jr., the Sheriff of Essex County, Massachusetts ("Cousins"); Thomas C. Goff, Special Sheriff of Essex County ("Goff"); and the Essex County Sheriff's Department (the "Department") (collectively, the "defendants"). The plaintiff asserts freedom of speech claims under both the First Amendment to the Constitution of the United States and Article XVI of the Massachusetts Declaration of Rights, both of which arise out of his termination as a corrections officer from the Department. He also has made a defamation claim arising from a suspension imposed on him in November, 2005. His First Amendment claim is asserted in count 1 of the complaint, pursuant to 42 U.S.C. § 1983.[1] Each of the present motions is addressed to the defendants' liability *vel non* as to the First Amendment claim.

Specifically, the plaintiff alleges that Cousins and Goff terminated him from his position as a corrections officer with the Department in retaliation for a statement he posted on a labor union website on November 30, 2005 (the "November 30 posting"). The plaintiff asserts that his November 30 posting was protected speech because it involved matters of public concern. He seeks judgment in his favor, as noted above, on the ground that his termination violated both his federal and state constitutional rights to freedom of speech. The defendants acknowledge that the November 30 posting was a motivating factor in their decision to terminate Curran's employment. They claim, however, that Curran's statement did not involve matters of public concern and, in any event, was so disruptive of the effective functioning of the Department that his termination did not violate the First Amend-

---

1. 42 U.S.C. § 1983 provides: "Every person who, under color of any ... custom ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...."

ment. The defendants assert alternatively that Cousins and Goff are protected from the plaintiff's First Amendment claim by qualified immunity, and that the Department, as a state government entity, may not be sued on a respondeat superior theory under § 1983, as the plaintiff proposes to do. The defendants seek a judgment that would dismiss the plaintiff's federal constitutional claim, and they ask that the court not exercise jurisdiction over the claims asserted under state law.

For the reasons explained below, I DENY the plaintiff's motion and GRANT the defendants' motion.

## II. Facts[2]

Curran was hired by the Department as a corrections officer in 1991. Compl. ¶ 7. Cousins initially was appointed Sheriff by the governor of Massachusetts in 1996, following the resignation of a former Sheriff who had pleaded guilty to corruption charges. Compl. ¶ 9. In the year following Cousins's appointment, the Essex County Correctional Officers Association, the union that represents the corrections officers of the Department (the "union" or "EC-COA"), was formed. Compl. ¶ 10. Discord developed between Cousins and the union with respect to the management of the Department. As a result, Cousins's tenure as Sheriff has been marked by conflict between him and the union. Compl. ¶¶ 10, 20; Def. Answer ¶ 10. In 2004, when Cousins ran for election as Sheriff, the union "took a strong public position against [him]." Compl. ¶ 11; Def. Answer ¶ 11.

Curran served as the campaign manager for Cousins's opponent in the 2004 election, a fact that was "widely known among Department employees, including Cousins himself." Compl. ¶ 13. Ultimately, Cousins was elected Sheriff in November, 2004. The plaintiff says that, within days of the election, Cousins declared that he would "deal with" those who had supported his opponent. During that same period of time, Cousins removed the plaintiff from the Department's Tactical Team, "a prestigious high security unit," and closed a boot camp, which, according to the plaintiff, had been created and run by Cousins's opponent in the election. Compl. ¶¶ 8,18.

### A. Thirty-day Suspension of Curran

On or about October 7, 2005, Department Captain Michael Halley approached Curran at work to discuss the Department's policy of conducting home visits when corrections officers call in sick (the "sick-call policy"). Compl. ¶ 26; Def. Answer ¶ 26; Def. Answer Ex. 11. When Curran told Halley that the sick-call policy wasted taxpayers' money, Halley replied that he was "just following orders."

2. The "facts" recited here are based on allegations in the complaint, supplemented in some cases by references to the defendants' answer (to the extent that allegations in the complaint are consistent with the answer) and by documents and other matters referred to in the pleadings. It is clear from the answer of the defendants that they dispute many of the plaintiff's allegations. The defendants recognize, however, that, having filed a motion under Rule 12(c), they confront the requirement that, in considering the motion, I must accept as true the well-pleaded averments of the complaint. *See* Defendants Memorandum in Opposition to the Plaintiff's Motion for Judgment on the Pleadings and in Support of their Cross–Motion for Judgment on the Pleadings at 2 ("Defendants' Brief"). For his part, the plaintiff appears to accept as true, for the purposes of the present motions, at least those aspects of the "facts" taken from the defendants' answer and referred to in the Facts Section of this memorandum and order. The plaintiff submitted with his motion, and in connection with his opposition to the defendants' motion, a statement of uncontested material facts, comprising a summary of what he says are the uncontested assertions made in the complaint and in the answer. *See generally,* Plaintiff's Statement of Uncontested Material Facts ("Facts").

Compl. ¶ 26. Curran reminded Halley of the Nuremberg war crimes trials following World War II, in which Nazi officers and government officials defended their conduct during the War by proclaiming that they were simply following the orders given by their superiors. Compl. ¶ 26; Def. Answer, Ex. 11.

Several weeks later, on October 25, 2005, Department Captain Arthur Statezni filed an Information Report with the Department. Def. Answer, Ex. 7; Compl. 27; Facts ¶ 16. He noted that he had spoken to Curran regarding the Department's sick-call policy, and that Curran had become "upset." Statezni also wrote that Curran had said. "You captains and deputies are gonna get shot." When Captain Statezni asked Curran if he intended his statements to be a threat, Curran replied, "not by me but by someone else." Further, Curran added the following: "I'll see you tomorrow at my house . . . I'll be out sickness in family [sic] . . . your [sic] not welcome" and "a cruiser would be parked in [your] driveway". Statezni then told Curran that "it sounds like your [sic] threatening me." Curran then terminated the conversation and departed. *Id.*

In response to these two incidents, the Department suspended Curran without pay for thirty days, effective November 23, 2005. Curran was also ordered to submit to a psychological examination to evaluate his fitness for duty as a corrections officer. Def. Answer, Ex. 10; Compl. ¶ 27; Facts ¶ 16.

### B. The November 30, 2005 internet posting

The union maintains a website, www.eccoa.org, which it independently owns, controls, and funds. Compl. ¶¶ 12, 23. The website is "maintained from a computer owned by the union situated in an office maintained by the union outside of the workplace." Compl. ¶ 23. The website contains a link to an electronic bulletin board—called by the union "a public forum"—on which registered users can post comments. Compl. ¶¶ 12, 21. Registration is unrestricted; members of the public at-large, therefore, can post comments, and anyone with internet access can read posted messages. Compl. ¶ 21. Between the time the website was created and November 30, 2005, thousands of messages had been posted on its public forum. *Id.* The discussion topics on this forum included "allegations of improprieties in the Department, poor supervision of inmates, misuse of public funds, corruption, political coercion of employees and contractors and unsafe jail conditions." [3] Compl. ¶ 22.

Curran read and posted messages on the union's website.[4] *See* Compl. ¶ 28.

---

3. There were also postings in 2005 that ridiculed Cousins, who is African American, and his management of the Department in coarse racial terms. One such posting referred to an African American employee of the Department as a "House slave," who always looks out for the "master" [Cousins] "who thinks he's white cause he lives in whitevill [sic] take a look in the mirror you spineless fu* * he evn [sic] had to marry a white woman nice trophy you think your [sic] better off with Ohara the sword s* * * * *." In some cases, the postings contained implied threats. A September 11, 2005 posting, for instance, stated:

  CAN ANYONE HELP OUT THERE. . . .

Yeah, there was someone who can help, but James Earl Ray is dead! [a reference to the convicted assassin of Dr. Martin Luther King Jr.]
(Def.Answer, Exs.5, 6) This posting is reminiscent of a statement attributed to England's King Henry II regarding his political enemy, Thomas Becket, the Archbishop of Canterbury. The King is said to have exclaimed, shortly before four of his knights assassinated Becket: "Will no rid me of this troublesome priest?"

4. For example, on August 1, 2004, he posted the following message:
  My main thoughts are, that there are five types of people in this world:

Approximately one week into his thirty-day suspension, Curran created the November 30 posting on the website's public forum. Compl. ¶ 29; Def. Answer ¶ 29.

The November 30 posting stated:

I wonder what it will take before one of the administrators gets the balls to stand up to the sheriff and do the right thing. How can a "man" allow all the evil that is unfairly being done to their people. I would think that out of the 320 administrators there would be one that had an ounce of integrity. How can you sit back and watch the unfairness of the discipline and harassment being doled out to political / union rivals of the sheriff and not stand up and say that it's not right and try to stop it. The excuse of "I need my job to take care of my family" = crap.

Look at the list of people that have taken the biggest hits, all are from the list of Murley supporters/Union people—most were both. I won't bother going through the list of names, but if you look at the comparison list of alleged violation vs punishment, you would see that Murly[sic]/Union people were harassed/punished much more severe. That's wrong.

... A totaly [sic] unrelated history lesson (don't want to get in trouble again) During WWII Adolf Hitler's (whose motto was "[sic]Have no pity! Act brutally"), generals were deathly afraid of him, followed orders regardless of how immoral/wrong the orders were. Near

1. The Jews that got marched into the death chambers (our officers)
2. The Dictator (Hitler) that ordered it (you know who)
3. The Nazi—SS that pushed the Jews in (Dictator's supporters)
4. The people that put on blinders and did nothing (anyone that does nothing)
5. The few that rebelled and ATTACKED the nazi's [sic] and saved some Jews lives. (us-you know who you are)[.]

the end, some of the generals realized just how wrong the orders were and started to plot against him knowing that the end was inevitable. Well you know how the story ended. My point is that the right thing is not always the easy thing.

Stay strong my borthers[sic]/sisters and I'll see you at the Union party. Joe C.

Def. Answer, Ex. 8.

In response to the November 30 posting, Cousins advised Curran, in a letter dated February 1, 2006, that Curran would be the subject of a disciplinary hearing with respect to allegations of misconduct arising from the "inappropriate and offensive comments regarding Adolf Hitler's generals in World War II" made while Curran was on suspension. Compl. ¶ 30; Def. Answer, Ex. 9. The hearing was held on February 13, 2006. Curran and his counsel presented evidence on Curran's behalf. Def. Answer, Ex. 10.

Curran subsequently received a letter from Goff dated February 17, 2006, in which Goff stated that, from a review of Curran's prior postings and comments, "it is clear that [Curran] identif[ies] Hitler as the Sheriff, the Jews as the Correctional Officers, the Nazi generals as the Department's Deputies and captain, and another group including [Curran], as ones who may attack the Nazis." Def. Answer, Ex. 10. Specifically, regarding the November 30 posting, the letter noted that Curran's "references are violent and reference plots

If you are the ones (# 3) that mess with and hurt my fellow officers, you are the worst form of human-aggressively hurting people for personal gain, I promised you I WILL do everything in my power to ensure that you are exposed and dealt with appropriately . . . .

(Def.Answer, Ex. 1).

against Hitler who[sic] [he has] repeatedly identified as the Sheriff." Compl. ¶ 31; Def. Answer, Ex. 10. Summing so, Goff stated: 'Based upon the evidence presented to me, examining not only your offensive and violent comments posted while on suspension but also the circumstances leading to your suspension, it is clear that you are either unable or unwilling to follow the Department's Work Rules and Code of Ethics. Consequently, "I have decided to terminate your employment with the Department effective today." Curran's employment was terminated effective February 17, 2006. Def. Answer, Ex. 10; Compl. 27; Facts ¶ 16.

## III. Discussion

### A. Standard

Fed.R.Civ.P. 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings". As I pointed out in *LaManque v. Massachusetts Department of Employment & Training*, 3 F.Supp.2d 83, 89 (D.Mass. 1998) (Lindsay, J.), a motion under this rule is intended to help the court to evaluate the legal sufficiency of a case in which the material facts are not in dispute. The First Circuit has described the standard of review of a Rule 12(c) motion in the following terms:

> In reviewing such a motion, the district court must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in her favor. Judgment on the pleadings under Rule 12(c) may not be entered unless it appears beyond doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief.

*Feliciano v. State of R. I.*, 160 F.3d 780, 788 (1st Cir.1998) (internal citations omitted). A motion under Rule 12(c), like a motion under Rule 12(b)(6), allows for no

resolution of contested facts, but unlike the Rule 12(b)(6) motion, the Rule 12(c) motion "implicates the pleadings as a whole." *Aponte–Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54–55 (1st Cir.2006).

Rule 12(c) also provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment" under Fed.R.Civ.P. 56. Not every consideration of a matter outside of the pleadings, however, requires conversion of the Rule 12(c) motion to a motion for summary judgment. Fed.R.Civ.P. 10(c), for example, makes "[a] copy of any written instrument which is an exhibit to a pleading ... a part thereof for all purposes." In addition, "documents the authenticity of which are [sic] not disputed by the parties; official public records; documents central to plaintiffs' claim; or documents sufficiently referred to in the complaint" may be considered by the court in deciding the Rule 12(c) motion. *Shapiro v. Haenn*, 190 F.Supp.2d 64, 66 (D.Me.2002) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)) (quotations ellipses omitted); *see also 5C Charles Alan Wright & Arthur R. Miller, Federal practice and Procedure § 1367 (3d ed. 2004) (When evaluating a 12(c) motion, courts may consider "competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice").*

Cross-motions for judgment on the pleadings will not affect this general standard; rather, "each party's right to a judgment must be determined from a consideration of his own motion as though no motion had been filed by the other party." E.H. Schopler, Annotation, *Proper procedure and course of action by trial court, where both parties move for judgment on the pleadings*, 59 A.L.R.2d 494, § 2[a]. *Cf. Adria Int'l Group, Inc. v. Ferre Dev.,*

*Inc.,* 241 F.3d 103, 107 (1st Cir.2001) (noting, as to cross-motions for summary judgment, that such motions "do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law. . . .") In this case, however, because each party's motion seeks relief that is diametrically opposed to, and thus completely precludes, the relief sought by the other party's motion, I may focus on only one of the motions—that of the plaintiff, because disposition of that motion will of necessity dispose of the motion of the defendants. *See Bellino v. Schlumberger Techs. Inc.,* 944 F.2d 26, 33 (1st Cir.1991) (noting that, where parties filed cross-motions for summary judgment, with respect to the plaintiff's entitlement to payments under a severance pay plan, taking opposite positions in their respective motions, it was not necessary for the district court to write separately on each of the parties' motion, so long as the court evaluated each motion on its own merits).

## B. First Amendment

■ When a public employee speaks out on a subject involving his or her public employer, a balance must be struck between the employee's interest, as a citizen, in commenting on the matter and the employer's interest in the efficient discharge of its public responsibilities. *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Supreme Court recently has explained the rationale for this balancing requirement in the following terms.

When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer or to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.

*Garcetti v. Ceballos,* —— U.S. ——, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006) (citations and quotations omitted). The Court has reminded us in Garcetti that "[t]he government as employer indeed has far broader powers than does the government as sovereign." *Id.* (quoting *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)).

■ The foregoing principles underlie the burden that a public employee must bear in making a First Amendment, free-speech claim against his employer. Thus, "[t]o prevail on a § 1983 claim, based on a violation of his First Amendment rights, a public employee . . . must show that '(1) his expression involved matters of public concern; (2) his interest in commenting upon those matters outweighed the [government employer's] interests in the efficient performance of its public services; and (3) his protected speech was a substantial or motivating factor in the . . . adverse employment actions.'" *Baron v. Suffolk County Sheriff's Dep't,* 402 F.3d 225, 233 (1st Cir.2005) (*quoting Lewis v. City of Boston,* 321 F.3d 207, 218 (1st

Cir.2003)). Because the defendants concede that the November 30 posting was a motivating factor in their decision to terminate his employment (*see* Hr'g Tr. at 33, 36), the questions before me concern the first two elements of the First Amendment claim. These are questions that I determine as a matter of law. *Connick v. Myers*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684 ("The inquiry into the protected status of speech is one of law, not fact."); *Lewis*, 321 F.3d at 219 (noting that the first two prongs of a public employee's claim of a free speech violation are questions of law, whereas the third prong is generally a fact question).

1. **Were the Statements in the November 30 Posting a Matter of Public concern?**

■ The first question raised by the plaintiff's claim is whether the November 30 posting involved a matter of public concern. The analysis of this question is framed by the teaching of the First Circuit in *O'Connor v. Steeves*, 994 F.2d 905 (1st Cir.1993).

> [T]he circumstances of a particular case may govern the appropriate approach. . . . Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression. On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone,* as a matter of inherent public concern *(e.g.,* internal working conditions, affecting only the speaker and co-workers), may require a more complete . . . analysis into the form and context of the public-employee ex-

pression, as revealed by the whole record, with a view to whether the community has *in fact* manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the 'form' of the employee's expression suggests a subjective intent to contribute to any such public discourse.

*Id.* at 913–14 (citations omitted) (emphasis in original).

The November 30 posting addresses itself to "the discipline and harassment being doled out to political/union rivals of the sheriff" employed in the Department. The statement thus is about internal working conditions of the Department—i.e., how Cousins treats its employees and the reaction of the employees to those working conditions. It is not one of those statements which, in the words of *O'Connor*, qualifies for protection "on the basis of its contents alone." 994 F.2d at 914. I must therefore consider the content, form, and context of the November 30 posting, "as revealed by the whole record" to determine whether the public has a concern in the internal workings of the Department, and whether the November 30 posting suggests that Curran intended to contribute to the public discourse about how the Department operated under Cousins. *Id.; see also Jordan v. Carter*, 428 F.3d 67, 72 (1st Cir.2005) (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684).

As to the form of the statement, it was posted on an electronic bulletin board linked to the union's website. Although the statement had a particular message for employees of the Department, the fact that Curran made it accessible, by means of the internet, to the world at large suggests that he chose a forum designed to reach a community beyond the Department.[5] *See*

---

5. The reality is that the internet almost by

definition tends to make universal that which

*Shelton Police Union, Inc. v. Voccola,* 125 F.Supp.2d 604, 628 (D.Conn.2001) (noting, as a factor in determining that the plaintiff's statement regarding, among other things, conflicts of interest within a police department, involved a matter of public concern, the fact that he had posted the statement on a union website); *cf. Connick,* 461 U.S. at 148, 103 S.Ct. 1684 (observing that respondent's circulation of a questionnaire, containing the statements at issue in the case, among her colleagues, and not to the public at large, indicated that she did not "seek to bring to light [to the public at large] actual or potential wrongdoing or breach of public trust on the part of" the government employer).[6] I find that consideration of the form of the November 30 posting weighs at least slightly in favor of a conclusion that the statement involved a matter of public concern.

I now consider the context of the November 30 posting. The following facts are important in this regard. The plaintiff was not just an employee who opposed the election of Cousins as Sheriff; the plaintiff had been campaign manager for the losing candidate. Shortly after the election, the plaintiff was removed from the elite Tactical Team, and it appears that he opposed Cousins's decision to close the boot camp, which the plaintiff claims was created by the losing candidate in the sheriff's race. The November 30 posting was made within a week of the plaintiff's having been disciplined with a thirty-day suspension for having complained about the sick-call policy instituted by Cousins. Cousins viewed the complaints as inappropriate and threatening. The November 30 posting was the latest in a series of postings to the same effect made by the plaintiff on the "public forum" of the union's website. One of the postings he had made contained this ominous statement: "If you are the ones ... that mess with and hurt my fellow officers, you are the worst form of human-aggressively hurting people for personal gain, I promise you I WILL do everything in my power to ensure that you are exposed and dealt with appropriately...." *See supra* note 4. The "public forum" itself, while containing postings of allegations of corruption and other improprieties in the Cousins administration, also included postings with disquieting racial overtones. Finally, as noted earlier, the November 30 posting was addressed primarily to conditions in the workplace and the treatment by Cousins of certain of his employees. It is, for the most part, an exhortation to those employees who would not speak out against what the plaintiff believed to be unfair treatment by Cousins of the union and those of Cousins's subordinate employees who backed his rival in the most recent election for the office of Sheriff: "How can you sit back and watch the unfairness ... and not stand up and say that it's not right and try to stop it. The excuse of 'I need my job to take care of my family' = crap." The statement ends with the following: "Stay strong my borthers[sic]/sisters and I'll see you at the Union party."

It is clear from the context, as described above, that the plaintiff had a private grievance with Cousins, much of it having to do with the plaintiff's status and treatment and the status and treatment of his fellow union members as employees in the Department. That the matter was one motivated in part by self-interest and concerned the plaintiff's job, however, is not dispositive because "[t]he First Amend-

otherwise might be merely parochial.

6. Of course, the fact that a public employee may confine his statements to the workplace

is not dispositive of whether the statement is a matter of public concern. *See Garcetti,* 126 S.Ct. at 1959.

ment protects some expressions related to the speaker's job." *Garcetti,* 126 S.Ct. at 1959; *see Fabiano v. Hopkins,* 352 F.3d 447, 455 (1st Cir.2003) (concluding "by a narrow margin" that an expression in the form of a lawsuit against a municipality's zoning board of appeal, motivated "in large part by self-interest," addressed a matter of public concern because the record supported a finding that one purpose of the lawsuit was to restore integrity to the zoning process and remedy parking congestion).

While the form of the November 30 posting tends toward the conclusion that the statement involved a matter of public concern, the context of the statement tends toward the conclusion that the statement is nothing more than the outpourings of a disgruntled employee. The examination of the content of the statement, therefore, takes on enhanced significance.

Taken as a whole, I find that, permeating the rhetoric that describes the Department as a Hitlerian environment, is the complaint, in the November 30 posting, that Cousins, for purely political reasons and by means of harassment and a system of punishments, unfairly treats those employees who supported his rival in the previous election. The statement suggests that Cousins was prepared to suffer a degradation in the morale and efficiency of the Department in his pursuit of his political enemies. The November 30 posting thus suggests that political loyalty, not merit, was the coin of value within the Department. In short, the November 30 posting can be read as a description of an abuse of power by Cousins. Speech that can be "fairly considered as relating to any matter of political, social, or other concern to

the community" can generally be categorized as implicating public concern. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. "Exposing governmental inefficiency and misconduct is a matter of considerable significance"; moreover, "public employers should, as a matter of good judgment, be receptive to constructive criticism offered by their employees." *Garcetti,* 126 S.Ct. at 1962 (quoting *Connick,* 461 U.S. at 149, 103 S.Ct. 1684); *see Guilloty Perez v. Pierluisi,* 339 F.3d 43, 52 (1st Cir.2003) (noting that "[t]he diligence and lawfulness of a police department's activities are matters of great interest to the public") (citing *Branton v. City of Dallas,* 272 F.3d 730, 740 (5th Cir.2001)) ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public"). Of especial significance is the Supreme Court's reminder in *Connick,* that "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." 461 U.S. at 149, 103 S.Ct. 1684 (determining that one question, inquiring whether assistant district attorneys ever felt pressured to work in political campaigns of candidates not of their choosing, included in a questionnaire circulated by an assistant district attorney among her colleagues, involved a matter of public concern because it is "apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal"). These principles, applied here, persuade me that the content of the November 30 posting, although overlaid with and motivated, in part, by the plaintiff's self-interest, addressed a matter of public concern.[7]

---

7. At the hearing on these motions, the defendants agreed that, taken as a whole, the complaint registered in the November 30 posting was that Cousins was unfairly disciplining his political rivals. *Draft Transcript of Hearing*

*("Tr.")* at 34. Indeed the defendants appear to concede that all but the final paragraph of the November 30 posting involved matters of

Having in mind the form, context, and content of the November 30 posting, I hold, like the court in *Fabiano,* that, by a narrow margin, the plaintiff has made a sufficient showing that the November 30 posting, at least in part, addressed a matter of public concern. *See,* 352 F.3d at 455.

### 2. *Pickering* balancing test

■ Having determined that Curran's November 30 posting involved a matter of public concern, I turn to the second step of the First Amendment inquiry. Here, I must "balance the significance of the interests served by the public-employee['s ] speech—including the employee's interest in communicating, and the interests of the community in receiving, information 'on matters of public importance'—against the governmental employer's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *O'Connor v. Steeves,* 994 F.2d 905, 915 (1st Cir.1993) (citing, *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The *Pickering* balance, as the First Circuit has observed, is by no means "an exact science . . . This balancing test is 'particularized'; if the plaintiff's constitutional claim is relatively weak, . . . the government need show less to counter it." *Fabiano,* 352 F.3d at 455. On the other hand, "the greater the value of the subject of the speech to the public, the more the balance tilts toward permitting the employee to express himself." *Guilloty Perez,* 339 F.3d at 53. There is, of course, fundamental importance in, "promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti,* 126 S.Ct. at 1958. Still, the legitimate concern of a governmental entity in the

efficient performance of its official responsibilities to the public require full consideration. As the court said in *Connick,*

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

461 U.S. at 151, 103 S.Ct. 1684 (quoting the separate opinion of Justice Powell in *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)).

The defendants contend that the plaintiff was not terminated because of the statements he made in the first two paragraphs of the November 30 posting. They say, rather, that the plaintiff was terminated because the statements he made in the third paragraph were inimical to the legitimate interest of Cousins in maintaining a staff of disciplined and efficient correctional officers who are obedient to proper commands of superior officers in the discharge of the functions of the Department, which include the incarceration of criminal offenders. Taken together with other conduct and statements of the plaintiff, the defendants argue, what the plaintiff said in the third paragraph had the effect of causing apprehension, among both superior and line officers, of plots hatched by their fellow employees to subvert Cousins's authority and jeopardize management of the Department's jail facility. The defendants point, in particular, to the following analogy to upheaval in Hitler's general staff as a source of the problem: "Near the end,

public concern. *Id.* at 30; *see* Defendants' Brief at 11–12 and n. 5

some of [Hitler's] generals realized just how wrong the orders were and started to plot against him knowing that the end was inevitable. WELL you know how the story ended. My point is that the right thing is not always the easy thing." The defendants argue that this kind of encouragement of disobedience to authority is especially troublesome in an agency whose public responsibilities include law enforcement and maintenance of a correctional institution. Quoting *Wagner v. City of Holyoke*, 241 F.Supp.2d 78, 91 (D.Mass. 2003), the defendants argue that "it is important to underline the fact that law enforcement agencies, as para-military organizations have been recognized as qualitatively different from other governmental branches; law enforcement employees are subject to greater First Amendment restraints than most other citizens." (citation and internal quotation marks omitted). In short, the defendants contend that the *Pickering* balance is in their favor, that the governmental interests of the Department outweigh the plaintiff's right to communicate his ideas, and that the termination of the plaintiff was therefore justified.

I fully agree with these contentions of the defendants; I find the plaintiff's arguments to the contrary to be unpersuasive.

The plaintiff counters that the defendants' concern about impairment of discipline and efficiency in the Department is mere speculation as to what might occur. He says that there is no evidence in the record of any problems along these lines having actually occurred. The third paragraph of the November 30 posting, the plaintiff argues, is nothing more than an urging of correctional officers to decline to follow illegal orders-those imposed simply as punishment of the political enemies of Cousins. Taking his lead from the defendants' description of the Department as a "paramilitary environment," the plaintiff points out that "[e]ven in the real military,

real soldiers are forbidden from obeying illegal orders." Plaintiff's Brief in Opposition to Defendants' Motion for Judgment on the Pleadings ("Pl.Opp.Br.") at 4 (citing *U.S. Army Field Manual 27–10, The Law of Land Warfare*, Section IV. Defenses Not Available § 509(b) and Articles 91 and 92 of the Uniform Code of Military Justice, 10 U.S.C. §§ 891–92, to the effect that a person in the military is bound only to obey lawful orders). The plaintiff concludes that the *Pickering* "balancing scale tilts heavily toward Curran," arguing that if "Curran's speech prompted a superior officer to disobey an illegal order, that speech did not cause a disruption, but promoted legal operation of the department." Pl. Opp. Br. at 10.

The plaintiff's most ardent argument in support of his contention that the *Pickering* balance is in his favor is that the absence of any evidence of an actual disruption or impairment of the Department's functions and discipline precludes a finding in favor of the defendants. He says: "Speculation about a possible relationship between Curran's web posting and potential disruption is not enough for the defendants to tilt the *Pickering* scale" in the defendants' favor. Pl. Opp. Br. at 8. In the plaintiff's view, evidence of an actual occurrence of disruption is required. *Id.* at 9.

The plaintiff is mistaken. It is not necessary for the public employer "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152, 103 S.Ct. 1684; *see Waters*, 511 U.S. at 673, 114 S.Ct. 1878 (noting that the Supreme Court has consistently given substantial weight "to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern" and observing that in

cases where the Court has deferred to such predictions "[f]ew of the examples ... discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative"); *see also Waters,* 511 U.S. at 680–81, 114 S.Ct. 1878 (finding, as a matter of law "potential disruptiveness" sufficient to outweigh the First Amendment value in a statement ascribed to the plaintiff (a nurse in a public hospital), critical of the plaintiff's supervisor and of the work in the hospital's obstetrics department, because the statement could discourage individuals from working in that department and undermine management's authority).[8] The record in this case demonstrates that the defendants reasonably predicted potential disruptiveness because of the November 30 posting. First that posting was made on a "public forum" of a union website on which others—some of whom, in the circumstances, the defendants reasonably could presume to have been employees of the Department—had posted criticisms of Cousins, other employees of the Department and Cousins's management of the Department in crude racial terms. See *supra* note 3. Although, the November 30 posting itself contained no offensive racial commentary, Cousins could reasonably assess the potential of the November 30 posting for disruption by its association with postings about him and his administration of the Department that did contain such commentary. "The First Amendment notwithstanding, a supervisor is entitled to a modicum of respect and decorum in work-related situations." *Hennessy v. City of Melrose,* 194 F.3d 237, 248 (1st Cir.1999). The employer need not tolerate speech that evinces or encourages "intransigence and insubordination." *Id.*

Ironically, the most significant indicator of potential disruptiveness in this record comes from the plaintiff himself. It was he, after all, who warned one of Cousins's superior officers that employees who enforced Cousins's sick-call policy ran the risk of being shot. It was he who warned that he would do everything in his power to ensure that the supporters of Cousins were "dealt with appropriately." *See supra,* § II(A). Those warnings could reasonably have been perceived by the defendants as threats that could cause an officer charged with enforcing policies of the Department to question whether enforcement of those policies was worth the risk to safety. "In such circumstances, the First Amendment does not require a public employer to stand idly by when one employee's expression engenders fear in a co-worker." *Hennessy,* 194 F.3d at 247.

The plaintiff next argues that the *Pickering* balance favors him, because he only urged employees of the Department to disobey "illegal orders." This argument misses the point: the question is not whether the plaintiff was advocating justifiable disobedience to illegal orders issued by Cousins, but rather whether the advocacy *in se* was disruptive or had the potential to disrupt the Department's efficient discharge of its public duties. Even speech on a matter of public concern, if made by a public employee, may be the basis of the employee's termination, if that speech interferes with government operations. *Waters,* 511 U.S. at 681, 114 S.Ct. 1878. So long as the public employee's termination was based on speech that "was either not on a matter of public concern, or on a matter of public concern but disruptive," the termination does not amount to a First Amendment violation. *Id.* The pow-

---

**8.** The plurality opinion in *Waters* is also significant because it held that a public employer may discipline an employee for what the employer reasonably believed was unprotected speech, even if what the employee said was actually protected speech. 511 U.S. at 681, 114 S.Ct. 1878.

er reposed in an agency of government to so restrict speech of its employees

> comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.[9]

*Id.* at 674–75, 114 S.Ct. 1878.

Beyond all of this, the potential disruptiveness of the third paragraph is not mitigated because the plaintiff confines his exhortation to the disobedience merely of "illegal orders." The plaintiff's retreat to the refuge of advocacy of disobedience to only illegal orders begs the question of what is "an illegal order" in the circumstances of this case.[10] I have no doubt that there would be a consensus that an order by Cousins to his subordinates that they shoot a sleeping inmate would be an illegal order. But what of other orders requiring greater discernment as to the question of lawfulness? To what sources may the Department employee have recourse to determine the lawfulness of the order? The plaintiff provides no answer to these questions; nor does he provide an answer to the most demanding question raised by his November 30 posting: can Cousins run the Department effectively if he must wonder, as to a given order, whether his employees will think it illegal and disobey it? The answer is obvious: he cannot.

Once again, the plaintiff's own conduct, as revealed by the record, illustrates the problem. The plaintiff disagreed with Cousins's sick-call policy. At the very least, the plaintiff thought it wasteful of public funds. But was the order illegal? The plaintiff thought that it was so offensive that he expressed to a superior officer that the officer and others enforcing the policy might encounter physical harm for their efforts.

For the foregoing reasons, I conclude that the *Pickering* balance here favors the defendants. They have shown that the third paragraph of the November 30 posting called for insubordination of by Department employees that would undermine Cousins's authority as Sheriff, engender disharmony in the workplace, damage morale among employees, and generally disrupt the operations of the Department. The defendants have shown also that the disruption would be particularly problematic, given that so much of the work of the Department has to do with the maintenance of a jail facility. I hold that the termination of the plaintiff did not violate the plaintiff's First Amendment right to free speech.

---

9. The plurality in *Waters* made another point that resonates in the circumstances of this case: "An employee who makes an unprotected statement is not immunized from discipline by the fact that the statement is surrounded by protected statements." 511 U.S. at 681, 114 S.Ct. 1878.

10. As noted above, the plaintiff, citing military law, suggests that employees in paramilitary organizations like the Department must adhere to the military mandate of disobedience to an unlawful order. But in the military, as elsewhere, the lawfulness of an order is determined "by examination of the circumstances under which that order is issued." *United States v. Dykes*, 6 M. J., 744, 746 (United States Navy Court of Military Review 1978). Furthermore, "[a]n order of a superior commissioned officer may be inferred to be lawful and it is disobeyed at the peril of the subordinate." *United States v. Hawkins*, 30 M.J. 682, 684 (United States Air Force Court of Military Review 1990).

## Conclusion

The motion of the plaintiff for judgment on the pleadings as to count 1 of the complaint is DENIED. The motion of the defendants for judgment on the pleadings as to count 1 of the complaint is GRANT-ED. Given these rulings, there is no need for me to reach the qualified immunity question. Having disposed of the plaintiff's federal claim, I decline to exercise jurisdiction over the remaining state law claims. *See Logiodice v. Trustees of Maine Cent. Inst.*, 296 F.3d 22, 32 (1st Cir.2002) ("In the absence of federal claims, the district court was entitled to leave [ state law claims] to the state courts") (citing 28 U.S.C. § 1367(c)). The clerk is directed to enter judgment for the defendants dismissing this action without prejudice to the plaintiff's right to pursue only the state law claims in the courts of Massachusetts.

IT IS SO ORDERED.