# United States Court of Appeals
## For the First Circuit

No. 07-1686

JOSEPH V. CURRAN,

Plaintiff, Appellant,

v.

FRANK G. COUSINS, JR., individually and in his official capacity
as Essex County Sheriff; THOMAS C. GOFF, individually and in his
official capacity as Essex County Special Sheriff; and ESSEX
COUNTY SHERIFF'S DEPARTMENT,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
Oberdorfer, Senior District Judge.[*]

Harvey A. Schwartz with whom Lori A. Jodoin and Rodgers,
Powers & Schwartz were on brief for appellant.
Geoffrey P. Wermuth with whom Michael J. Pacinda and Murphy,
Hesse, Toomey & Lehane LLP were on brief for appellees.

December 5, 2007

[*] Of the District of Columbia, sitting by designation.

**LYNCH**, **Circuit Judge**.  Joseph V. Curran sued the Essex County Sheriff's Department, the Sheriff, and others, asserting they terminated his employment as a correctional officer in retaliation for his speech, in violation of the First Amendment and the Massachusetts Declaration of Rights.  The district court found that the public interest in the employee's speech was outweighed by the danger the speech would cause to the effective functioning of the Department and entered judgment for the defendants.  Curran v. Cousins, 482 F. Supp. 2d 36 (D. Mass. 2007).  We affirm, in our first case on the subject since the Supreme Court's opinion in Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).

I.

Curran was hired by the Essex County Sheriff's Department as a corrections officer on June 1, 1991 and remained one until his termination on February 17, 2006.

Frank G. Cousins, Jr. was appointed Sheriff of Essex County by the governor of Massachusetts in 1996, after the former Sheriff pleaded guilty to corruption charges.  The following year, the Essex County Correctional Officers Association (the "union" or "ECCOA") was formed.  Cousins and the union had a contentious relationship, creating a high level of public conflict during Cousins's tenure.

In 2004, Cousins ran for re-election as Sheriff.  The union took a strong public position against him.  Curran served as

the campaign manager for Bill Murley, Cousins's opponent; this was widely known among Department employees, including Cousins himself. Cousins was re-elected in November 2004.

The plaintiff claims that within days of the election, Cousins vowed to "deal with" those who supported his opponent. Curran also claims that immediately thereafter, Cousins removed him from the Department's Tactical Team, a prestigious high-security unit. Cousins then closed a boot camp program that had been created and led by Cousins's opponent.

A.      Thirty-Day Suspension of Curran

On September 8, 2005, roughly a year after Cousins's re-election, Curran called in sick to work. About a month later, on October 7, 2005, Department Captain Michael Halley approached Curran at work to discuss the Department's policy of conducting home visits when corrections officers called in sick (the "sick-call policy"), apparently in reference to Curran's earlier sick day. [The record does not indicate whether the Department had visited Curran at home during his September 8 sick day.] When Curran told Halley that the sick-call policy wasted taxpayers' money, Halley responded that he was "just following orders." In response, Curran told Halley that German officers had raised the same defense during the Nuremberg war crimes trials following World War II.

-3-

Three weeks later, on October 25, 2005, Department Captain Arthur Statezni discussed with Curran concerns about whether Curran's September 8 sick leave was legitimate. Later that day, Captain Statezni filed an Information Report with the Department which stated that he felt threatened by Curran in that conversation. Statezni wrote that Curran became "upset" in the conversation and then said to Statezni, "[Y]ou captains and deputies are gonna get shot." When Captain Statezni asked Curran if he was threatening him, Curran replied, "[N]ot by me but by someone else." Statezni's report recounted that Curran added, "I'll see you tomorrow at my house . . . I'll be out sickness in family [sic] . . . you['re] not welcome" and "a cruiser would be parked in [my] driveway." Statezni then told Curran that "it sounds like you['re] threatening me." Curran then left work for the day.

As a result of Statezni's complaint about Curran, the Department held a disciplinary hearing on November 14, 2005. The Department found Curran's comments to be "threatening and menacing" and that the two incidents "would tend to adversely affect the operations of the Department by prompting employees to second-guess direct orders."[1] It suspended Curran for thirty days starting on

---

[1] Cousins also wrote a letter on November 1, 2005 to the police chief of Billerica -- where Curran held a town firearms permit -- explaining the incidents and informing the chief that Curran was on paid administrative leave pending a disciplinary hearing. As a result, the Billerica police chief revoked Curran's

November 23, 2005.  Curran was also ordered to submit to a psychological evaluation to assess his fitness for duty as a corrections officer.  Within a week, Curran had posted an angry message on the union website.

B.        Curran's Internet Posting

The union maintained a website, www.eccoa.org, which it owned and controlled fully independently from the Department.  The website contained a public discussion board on which any registered user could post comments and statements.  Any person with access to the Internet -- whether a member of the union or not -- could register, post, and read messages.  Some messages were posted using pseudonyms while others had readily identifiable authors.  Thousands of messages were posted on the discussion board since it was created.  According to the complaint, topics discussed included "allegations of improprieties in the Department, poor supervision of inmates, misuse of public funds, corruption, political coercion of employees and contractors and unsafe jail conditions."

The discussion board had earlier hosted threatening and racist messages by others directed towards Cousins, who is African-American.  One posting included a picture superimposing cross hairs on the face of the Sheriff with a caption stating, "Pull the trigger on the NIGGER!!!"  Another posting referred to the Sheriff as a "pimp" and his subordinates as "whore[s]."  One poster

_____

firearms license.

-5-

referred to a Department employee as a "[h]ouse slave" and the Sheriff as the "master who thinks he's white cause he lives in whitevill."[2] In a posting responding to a question of whether there was anyone able to help address alleged disparities in discipline, the author responded, "Yeah, there was someone who can [sic] help, but James Earl Ray is DEAD!"[3] Cousins requested that the Essex County District Attorney investigate the postings for potential hate crimes and civil rights violations.

Curran had also posted messages on the board. On August 1, 2004, he posted the following:

> My main thoughts are, that there are five types of people in this world:
>
> > 1. The Jews that got marched into the death chambers (our officers)
> > 2. The Dictator (Hitler) that ordered it (you know who)
> > 3. The Nazi - SS that pushed the Jews in (Dictator's supporters)
> > 4. The people that put on blinders and did nothing (any one that does nothing)
> > 5. The few that rebelled and ATTACKED the nazi's and saved some Jews lives. (us - you know who you are)
>
> If you are the ones (#3) that mess with and hurt my fellow officers, you are the worst form of human - aggressively hurting people for personal gain, I promised you I WILL do everything in my power to ensure that you are exposed and dealt with appropriately. . . .

---

[2] All quotations from the website postings are reproduced verbatim.

[3] James Earl Ray was convicted of assassinating Dr. Martin Luther King, Jr.

-6-

If you're a #5 person I praise you for having the courage of your conviction. But be careful about bashing the #4 people, not everyone has been brought up to fight the good fight. Thank God for people like Harriet Tubman who helped free the slaves, Rosa Parks - the one who started the civil rights movement (bus), Audey Murphy (WWII), most decorated soldier, and Bill Murley, for running against this dictator. . . .

More than a year later and seven days into Curran's suspension, on November 30, 2005, Curran posted a message on the discussion board under a topic entitled "inmate assault." The message stated:

I wonder what it will take before one of the administrators gets the balls to stand up to the sheriff and do the right thing. How can a "man" allow all the evil that is unfairly being done to their people. I would think that out of the 320 administrators there would be one that had an ounce of integrity. How can you sit back and watch the unfairness of the discipline and harassement being doled out to political/union rivals of the sheriff and not stand up and say that it's not right and try to stop it. The excuse of "I need my job to take care of my family" = crap.

Look at the list of people that have taken the biggest hits, all are from the list of Murley supporters/ Union people - most were both. I won't bother going through the list of names, but if you look at the comparison list of alleged violation vs punishment, you would see that Murly/Union people were harassed/punished much more severe. That's wrong.

A totaly unrelated history lesson (don't want to get in trouble again)
During WWII Adolf Hitler's (whose motto was ""Have no pity! Act brutally"), generals were deathly afraid of him, followed orders

> regardless of how immoral/wrong the orders were. Near the end, some of the generals realized just how wrong the orders were and started to plot against him knowing that the end was inevitable. Well you know how the story ended. My point is that the right thing is not always the easy thing.
>
> Stay strong my borthers/sisters and I'll see you at the Union party.
>
> Joe C.
> _____
> Death before dishonor

There is no dispute Curran posted this message to the website.

Cousins responded to the November 30 posting with a letter to Curran dated February 1, 2006, informing Curran that he would be subject to another disciplinary hearing "due to allegations of misconduct against you in making inappropriate and offensive comments regarding Adolf Hitler's generals in World War II while on suspension." The letter noted that Curran's previous suspension had been based in part on references to German officers in World War II, and stated that the alleged misconduct would be in direct violation of Departmental policies, procedures and employee work rules, and the collective bargaining agreement.

The disciplinary hearing took place on February 13, 2006. Curran and his counsel presented evidence on his behalf, but Curran declined to testify in his own defense. After the hearing, the Department, by letter dated February 17, 2006 from Special Sheriff Thomas C. Goff, notified Curran that his employment was terminated. The February 17, 2006 termination letter expressly referenced

Curran's prior discipline for "confront[ing] senior officers in a threatening and/or insubordinate manner while on duty."[4] This letter stated that after reviewing Curran's website postings, it was "clear that you identify Hitler as the Sheriff, the Jews as the Correctional Officers, the Nazi generals as the Department's deputies and captains, and another group, including yourself, as ones who may attack the Nazis." The letter noted that "your references [in the November 30 posting] are violent and reference plots against Hitler who you have repeatedly identified as the Sheriff." Taking into account both the November 30 posting and "the circumstances leading to your suspension," the letter informed Curran that "it is clear that you are either unable or unwilling to follow the Department's Work Rules and Code of Ethics. Consequently, I have decided to terminate your employment with the Department effective today."

---

[4] Specifically, the letter stated:

Reviewing your prior disciplinary record, on October 27, 2005, the Department placed you on paid administrative leave pending a hearing regarding your misconduct on October 7 and October 25, 2005, in which you confronted senior officers in a threatening and/or insubordinate manner while on duty. In particular, on October 7, 2005, you equated captains and deputies' compliance with Departmental orders to Nazi officers following orders to execute Jews during the Holocaust. The Department found that your conduct in October 2005 was threatening and menacing, and would tend to adversely affect the operations of the Department by prompting employees to second-guess direct orders.

C.        Lawsuit: Procedural History

On March 30, 2006, Curran filed a complaint pursuant to 42 U.S.C. § 1983 against Cousins and Goff, in their individual and official capacities, and the Department, asserting violations of Curran's First Amendment rights. The complaint also pled a pendent state-law claim under the Massachusetts Declaration of Rights, and defamation based on Cousins's letter to the Billerica police chief during Curran's suspension. After the defendants answered, Curran moved for partial judgment on the pleadings under Rule 12(c). The defendants filed a cross-motion for judgment on the pleadings thereafter.

The district court, on March 30, 2007, granted the defendants' motion for judgment on the pleadings on the § 1983 First Amendment claim and declined to exercise jurisdiction over the remaining state-law claims, leaving Curran to pursue his state-law claims in state court. Curran, 482 F. Supp. 2d at 50. The district court found that while Curran's November 30 posting narrowly involved a matter of public concern, id. at 46, the interests served by his speech were outweighed by the Department's legitimate interests in preventing disruptions in carrying out its mission of law enforcement and maintenance of a correctional institution. Id. at 49.

Curran appeals the district court's grant of judgment on the pleadings to the defendants and the denial of his motion for judgment on the pleadings.

II.

A.          Standard of Review

We review judgments on the pleadings under Federal Rule of Civil Procedure 12(c) de novo. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 55 (1st Cir. 2006). The district court had before it cross-motions for judgment on the pleadings. It appropriately focused its opinion on the defendants' motion for judgment on the pleadings: since a "court may not grant a defendant's Rule 12(c) motion 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" granting the defendant's motion will necessarily resolve the plaintiff's motion. Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (quoting George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir. 1977)); cf. Bellino v. Schlumberger Techs., Inc., 944 F.2d 26, 33 (1st Cir. 1991) (district court not required to write separately on each party's cross-motion for summary judgment as long as it evaluated each motion on its own merits).

A Rule 12(c) motion implicates the pleadings as a whole. Aponte-Torres, 445 F.3d at 55. Because this motion, like a motion to dismiss a complaint under Rule 12(b)(6), involves some

-11-

assessment of the merits, we view the facts contained in the pleadings in the light most favorable to the party opposing the motion -- here, the plaintiff -- and draw all reasonable inferences in the plaintiff's favor.  Id.; R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).  "The court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin., 446 F.3d at 182.

In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, we may consider "documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint."  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (under Rule 12(b)(6)).  This is true even when the documents are incorporated into the movant's pleadings.[5]  Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document [offered by the movant]

---

[5]    Curran argues that because he is entitled to the most favorable reading of the facts, we may not consider exhibits attached to the defendants' answer. We reject his argument. There is no dispute over the authenticity of the exhibits. Curran moved to strike four of the website postings by others that were offensive on the grounds that they were irrelevant, but has not raised any argument then (or now) as to their authenticity. Because the postings show that the discussion board was relevant as it was clearly a forum for threatening commentary directed towards Cousins, the district court appropriately denied the motion to strike.

-12-

(the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it . . . ." (citing <u>Fudge</u> v. <u>Penthouse Int'l, Ltd.</u>, 840 F.2d 1012, 1015 (1st Cir. 1988))). <u>See</u> <u>also</u> <u>Dirrane</u> v. <u>Brookline Police Dept.</u>, 315 F.3d 65, 69 n.2 (1st Cir. 2002).

This is similar to the situation when a court is presented with cross-motions for summary judgment. Here, as there, "[c]ross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Barnes</u> v. <u>Fleet Nat'l Bank, N.A.</u>, 370 F.3d 164, 170 (1st Cir. 2004) (quoting <u>Wightman</u> v. <u>Springfield Terminal Ry.</u>, 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

B.        The First Amendment Claim

Public employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees. <u>Connick</u> v. <u>Myers</u>, 461 U.S. 138, 142 (1983). Still, those rights are not absolute: "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." <u>Garcetti</u>, 126 S. Ct. at 1957. If a court finds the employee has made statements that are within the scope of First Amendment protection, the court must then "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency

-13-

of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); see also, e.g., Waters v. Churchill, 511 U.S. 661, 668 (1994); Rankin v. McPherson, 483 U.S. 378, 388 (1987); Connick, 461 U.S. at 150-52.

Garcetti has clarified and expanded on the earlier law. The Supreme Court described the correct analysis as involving a two-step initial inquiry. The first step requires a determination of:

> whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.

Garcetti, 126 S.Ct. at 1958 (citing Connick, 461 U.S. at 147; Pickering, 391 U.S. at 568) (citations omitted). Garcetti recognizes that this first step itself has two subparts: (a) that the employee spoke as a citizen and (b) that the speech was on a matter of public concern. Id.

If the answer to the Garcetti's first (two subpart) step is yes, then the possibility of a First Amendment claim arises, and the second step of the inquiry is made:

> The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must

-14-

> be directed at speech that has some potential
> to affect the entity's operations.

Id. (citing Pickering, 391 U.S. at 568) (citation omitted).

Garcetti's initial steps are consistent with this circuit's prior three-part test, Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 11 (1st Cir. 2003), which also asks a third question. That third question is concerned with causation, with whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision. Of course, the employer must have the opportunity to prove that it would have made the same decision regardless of the protected expression. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). The parties agree there is a causal relationship between termination of Curran's employment and his speech, particularly his posting on November 30, 2005.

This is significant in the context of a motion for judgment on the pleadings because it is the judge who decides as a matter of law the issues in the two steps Garcetti identifies. See Connick, 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact."); Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003). The court must first determine whether the speech involved is entitled to any First Amendment protection -- that is, whether the speech is by an employee acting as a citizen on a matter of public concern. If so, the court then decides whether the public employer "had an adequate

justification," to use Garcetti's rephrasing of the Pickering test. 126 S. Ct. at 1958. Whatever the label of the cross-motions before the district court, the material facts were not disputed. The issues were ones for the court to decide.

1.      Speech as a Citizen on a Matter of Public Concern

We analyze the first Garcetti question as to his speech, one leading to his prior suspension and his speech in his November 30 posting. The termination of Curran's employment was the culmination of progressive discipline within the Department, and so both events are relevant.

Curran had earlier been disciplined, through a suspension, for threats made to others. The suspension did not involve speech by Curran which had First Amendment protection under Garcetti. Curran's initial threats were made not as a citizen, but were made in the course of his duties within the Department, to his superiors, and during a discussion of official Department policy. Thus, the first event in the history leading to Curran's termination involved speech which had no First Amendment protection. See Garcetti, 126 S.Ct. at 1960.

The plaintiff concedes that he was fired because of his November 30 posting: "It is uncontested, based on the pleadings, that but for the November 30 statement, the plaintiff would not have been fired and that because of the November 30 statement, he was fired." We ask whether the November 30 posting involved speech

-16-

Curran made (a) as a citizen and (b) on a matter of public concern. We will assume arguendo that Curran was acting as a citizen since the posting was on a union website open to public posting and viewing. As to the next inquiry, the district court found that the posting did contain speech on matters of public concern. We agree, rejecting the defendants' argument that no matter of public concern was involved.

Whether an employee's speech involves a "matter of public concern" is a case-specific, fact-dependent inquiry. While an employee has his own First Amendment interest in his speech, "the First Amendment interests at stake extend beyond the individual speaker." Garcetti, 126 S.Ct. at 1958. The Supreme Court has acknowledged "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." Id.

If the topic of the speech "is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression." Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 233 (1st Cir. 2005). Matters of inherent concern include official malfeasance, abuse of office, and neglect of duties. See id. at 234; Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. 2005).

The first and second paragraphs of Curran's November 30 posting may be read as accusing Cousins of using political favoritism rather than merit in making personnel decisions as to non-policymaking employees. See Rutan v. Republican Party of Ill., 497 U.S. 62, 71 n.5, 75-76 (1990) (holding that consideration of political affiliation is impermissible in making employment decisions about non-policymaking employees). In the first paragraph, Curran asks, "How can you sit back and watch the unfairness of the discipline and harassement [sic] being doled out to political/union rivals of the sheriff and not stand up and say that it's not right and try to stop it." He then references "the list of people that have taken the biggest hits," points out that those people were all supporters of the union or Cousins's political opponent, and notes that "if you look at the comparison list of alleged violation vs punishment, you would see that Murly[sic]/Union people were harassed/punished much more severe. That's wrong."

The topic of a public official basing personnel actions, as to non-policymaking employees, on political affiliation rather than merit is a topic of public concern. See, e.g., Connick, 461 U.S. at 149 (finding speech about political pressure applied to employees in a prosecutor's office to be a matter of public concern).

There was public interest value in the identified portions of the November 30 posting. However, that does not establish that there was First Amendment value in the remainder of the posting.

2.  Adequacy of the Defendants' Justification

We turn to the next step in the inquiry: whether the Department "had an adequate justification" for terminating Curran.[6] Garcetti, 126 S. Ct. at 1958.

"Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient

_____

[6]  On appeal, Curran also makes an argument purportedly based on Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004). Curran suggests there is yet a further issue to be addressed regarding whether, even if the firing was caused by the November 30 posting, there was an underlying motivation to get rid of Curran because he supported Cousins's opponent and the Sheriff seized on the posting. We reject the argument. The issue was not preserved. Indeed, plaintiff concedes that the November 30 posting was the but for cause of his firing. It is clear that the Mihos reference was made in the district court for the purpose of arguing Curran should prevail in the Pickering balance. Curran may not switch theories on appeal. Ouimette v. Moran, 942 F.2d 1, 12 (1st Cir. 1991). Further, Curran misreads Mihos, which is a qualified immunity case. 358 F.3d at 102.

Even if such an argument were not waived and were permissible, there is no factual support for it. The record confirms this. Curran's employment continued without incident for over eleven months after the election. His earlier provocative posting of August 1, 2004 did not subject him to any type of discipline. There are multiple other instances in the record, none of which resulted in Curran's dismissal -- Curran's threatening comments, his earlier suspension, his termination letter, and the Sheriff's letter to the Billerica police chief about Curran's conduct -- that make clear that Curran was terminated as a result of his November 30 posting.

-19-

provision of public services." Id. Because public employees "often occupy trusted positions in society[,] [w]hen they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." Id. However, because a citizen who works for the government is nonetheless a citizen, "so long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Id.

Here, there is no dispute about what Curran said in the posting.[7] Further, there is no dispute about the employer's stated justifications, which are contained in the termination letter as follows:

(1) Based on Curran's actions on October 7 and October 25, he had been suspended because his conduct "was threatening and menacing, and would tend to adversely affect the operations of the Department by prompting employees to second-guess direct orders."[8]

---

[7] What Curran said is what the employer believed he said and so this case does not raise the issue involved in Waters, 511 U.S. at 668. Without addressing the extent to which the First Amendment embodies any procedural requirements for determining what the speech by the employee actually was, cf. id. at 671, we note that Curran did receive procedural protections in the form of a termination hearing under the collective bargaining agreement, at which Curran had counsel and presented evidence.

[8] The earlier suspension was an entirely appropriate matter for the Department to consider in evaluating what actions should be taken in response to the posting of November 30. See Hennessy v. City of Melrose, 194 F.3d 237, 247 (1st Cir. 1999).

-20-

(2)  While Curran was serving his suspension on November 30, he "made highly inappropriate and violent comments regarding Adolf Hitler and the Nazis on the ECCOA's website."  Reviewing Curran's prior website postings and comments, it is clear that Curran identifies Hitler as the Sheriff, the Jews as the Correctional Officers, the Nazi generals as the Department's deputies and captains, and another group -- including himself -- as those who may attack the Nazis.  In Curran's November 30 posting, Curran's references are violent and reference plots against Hitler, whom Curran has repeatedly identified as the Sheriff.

(3) In his psychiatric evaluation required as part of the November 23 discipline, Curran "acknowledged the importance of [the employer's interest in Curran's] getting along and not creating 'friction' with the administration and senior officers."

(4)  Based on not only the "offensive and violent comments posted while on suspension but also the circumstances leading to [Curran's] suspension, it [was] clear that [he was] either unable or unwilling to follow the Department's Work Rules and Code of Ethics."

We turn to Curran's arguments as to why these reasons are insufficient to justify the termination of his employment.  Curran recognizes that the stronger the First Amendment interests in the speech, the stronger the justification the employer must have.  See

Connick, 461 U.S. at 150. From this, Curran first argues that the value of his speech was very high.[9]

That some of Curran's speech expressed topics of value in the civil discourse does not render all of his speech protected. See, e.g., Waters, 511 U.S. at 681 ("An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."); Heil v. Santoro, 147 F.3d 103, 110 (2d Cir. 1998) (noting that "an employee who engages in unprotected conduct [cannot] escap[e] discipline for that conduct by the fact that it was related to protected conduct"); cf. Hennessy v. City of Melrose, 194 F.3d 237, 246-47 (1st Cir. 1999) (analyzing each instance of speech separately to determine whether it was protected). The November 30 posting included speech going far beyond providing information in which there was a legitimate public interest.

The posting urged Department administrators to engage in insubordination and insulted their integrity. The posting then referred to Adolf Hitler and his generals, likening Sheriff Cousins

---

[9] The defendants argue that Curran's motive was purely personal and thus entitled to less First Amendment weight in the balancing test. We do not go down that path. It may not be appropriate to evaluate the value of the speech to the public by looking at whether plaintiff's motives were good, bad, or indifferent.

We also express no view on defendants' other argument that speech which is repetitive of speech already in the public domain is entitled to lesser protection.

to Hitler, with a motto of "Have no pity!  Act brutally."  This repeated the theme of his August 1 posting, that the Sheriff was "the Dictator (Hitler)," who ordered the "Jews . . . marched into the death chambers (our officers)."  Curran likened those who followed Cousins's instructions to Hitler's generals, and accused them of following orders regardless of how immoral or wrong the orders were.

The posting referred to a plot by Hitler's generals against him.  The reference was to a July 20, 1944 attempt by German military officers to assassinate Hitler by placing a bomb in a meeting which Hitler attended.  See M.R.D. Foot, Schwarze Kapelle, in The Oxford Companion to World War II 764, 765 (I.C.B. Dear & M.R.D. Foot, eds., 2005).  The bomb went off and killed three people; Hitler escaped death.  Id.  By analogy, Curran urged a similar secret plot against the Sheriff, which was "the right thing [if] not always the easy thing."  Indeed, Curran ended the posting by saying, "Death before dishonor."

It is difficult to find any First Amendment value to the citizenry in these portions of the November 30 posting.  To start, the speech is defamatory of the Sheriff and put pejorative labels on those who did not engage in insubordination.  Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance.  Jordan, 428 F.3d at 74 (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1290 (11th Cir. 2000)).

Curran attempts to excuse his intemperate and extreme language by referring to language from general free speech cases protecting robust and offensive speech. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."). The Supreme Court has flatly rejected that defense in public employee cases. The Court held in Waters that the general free speech jurisprudence on which Curran relies "cannot reasonably be applied to speech by government employees." 511 U.S. at 672 (plurality opinion). Further, "[A] government employer may bar its employees from using [] offensive utterance[s] to . . . the public or to the people with whom they work. . . . [W]hen an employee counsels her co-workers to do their job in a way with which the public employer disagrees, her managers may tell her to stop, rather than relying on counterspeech." Id.

At the heart of this case is Curran's argument that no one could have reasonably taken this speech as being either disruptive or threatening; in essence, Curran contends that the Department overreacted to his speech, no matter how extreme it was. He buttresses this with an argument that the Department did not show that the speech had any actual detrimental effect. Both arguments fail.

An employer need not show an actual adverse effect in order to terminate an employee under the Garcetti/Pickering test. Garcetti itself refers to "speech that has some potential to affect" a public employer's operations. 126 S. Ct. at 1958. An employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152. In Waters, the Court stated that it has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative." 511 U.S. at 673.

The substantial risk of disruption to the department is apparent from the text of the speech and the escalation of Curran's speech.[10] Significant weight is given to the public employer's "reasonable predictions of disruption, even when the speech involved is on a matter of public concern." Id. There is little question in this case that the Department's concerns about

_____

[10] Our decision in O'Connor v. Steeves, 994 F.2d 905, 916 (1st Cir. 1993), on which Curran relies, does not help him. In O'Connor, the court found that the defendant had not "met its burden of showing that the disruption was attributable" to the plaintiff's speech. Id. Here, there is no question that any risk of disruption came from Curran's conduct.

disruption were reasonable.[11] The statements here directly went to impairing discipline by superiors, disrupting harmony and creating friction in working relationships, undermining confidence in the administration, invoking oppositional personal loyalties, and interfering with the regular operation of the enterprise. See Rankin, 483 U.S. at 388.

The Department is a law enforcement agency and administers a correctional facility, heightening the governmental interest on the other side of the balance under our circuit precedent. See, e.g., Guilloty Perez, 339 F.3d at 53; Jordan, 428 F.3d at 74. Other circuits agree. See, e.g., Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (holding that the "heightened need for order, loyalty, morale and harmony" in a law enforcement agency affords it "more latitude in responding to the speech of its officers than other government employers"); O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) ("[B]ecause of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees."). The district court reached the correct result.

_____

[11] Curran argues that his call to "do the right thing" was an entreaty to his fellow officers to avoid following what he thought were illegal orders. What is relevant for the purposes of preventing disruption is the Department's reasonable reading, not Curran's subjective intent.

III.

The decision of the district court is affirmed.  Costs are awarded to the defendants.