Roach, Christine M., J.
This was a First Amendment case against the City of Worcester brought by a former management level municipal employee. Plaintiff Elizabeth Mullaney claimed her supervisor, former City Manager and individual Defendant Thomas R. Hoover, wrongly retaliated against her for three identified expressions of her free speech rights by instituting progressive discipline against her. Following her “reassignment of position and duties” on March 19, 2001, Mullaney never again worked for the City, having taken an extended sick leave and ultimately an early retirement package, which substantially reduced her income and future compensation. The First Amended Complaint in two counts claimed intentional infliction of emotional distress, as well as violation of Plaintiffs First Amendment rights pursuant to 42 U.S.C. Section 1983.
The case was tried before the court and a juiy October 31, November 4, and November 5, 2008. The threshold question of law — whether Plaintiff could demonstrate facts sufficient to maintain her First Amendment claim pursuant to Garcetti v. Ceballos, 547 U.S. 410 (2006) — was reserved by the court for decision until hearing all of Plaintiffs trial evidence.[1] Ruling on the question of protected speech is appropriate for summary judgment and is commonly made in that context. However, the opportunity for such a ruling in this case was lost,[2] and Plaintiff received a full bench trial on the issue.[3]
The court’s reading of Garcetti and the decisions of the many federal Circuit Courts of Appeal that have interpreted Garcetti to date[4] is that it is the court’s duty to rule, as a threshold matter of law, on whether or not Plaintiff has presented sufficient evidence of constitutionally protected speech, such that the court could go on to submit any further factual questions with respect to the government’s actions in response to that speech, and proximate causation of any com-pensable damage, to the juiy. After hearing all of the evidence,[5] as well as hearing extensive oral argument on the question on November 6, 2008 pursuant to Defendants’ Motion for Directed Verdict, the court ruled Plaintiff failed to meet the Garcetti standard as a matter of law.

Undisputed Background Facts With Respect to Plaintiff’s Speech

Plaintiff called six witnesses, including Defendant Hoover, who arrived from Michigan at the court’s urging to attend the third day of trial. The parties stipulated to fifteen (15) Trial Exhibits marked by the court reporter. As the first and most lengthy of the witnesses, Plaintiff offered extensive testimony about her employment relationship and the documents in evidence. The court finds the undisputed employment context which emerged at trial to be as follows.[6]
Plaintiff worked for the City of Worcester for twenty-six years in a variety of roles related to elder affairs. In 1993, she was promoted by the former City Manager to Executive Director of the Executive Office of Elder Affairs (“the Department”), a cabinet-level position. When Mr. Hoover became City Manager in 1994, he maintained Ms. Mullaney in this role, although he had the authority to name another of his choosing. Mr. Hoover proceeded to evaluate Ms. Mullaney on an *37 annual basis thereafter. Three such Performance Evaluations were admitted by the parties, for the periods 1/1/96 to 6/30/96, 7/1/97 to 6/30/98, and 7/1/00 to 7/1/01, respectively. Trial Exhibits 7-9.[7] These documents evidence a consistent pattern. Although in the majority of categories of review Ms. Mullaney scored “meets expectations,” and in some categories she achieved the higher score of “meritorious,” Mr. Hoover commented throughout on concerns he held about her performance, such as: “Has had difficulty in carrying administrative agenda. Must better represent and support the City Manager”; “Needs to improve on avoiding controversy in representing administration, i.e. Senior Center Project”; “Has had difficulty in carrying administration’s agenda. Must solve situations before City Manager needs to get involved” (Trial Exhibit 9, 1996); “Meets expectations but for too many complaints from others this past year leaving unresolved problems”; “Too much dissatisfaction w/Council reports. Spots City Manager with/department problems a supposed to (sic) providing verbal support in presentations”; “Must avoid surprises when reporting department inadequacies”; and “Too many surprises. Sometimes acts like independent agency. Commission is advisory, not policy.” (Trial Exhibit 7, 2001.)
While this evidence reflects rather longstanding and significant policy and procedural disagreement between Plaintiff and her boss (see also Trial Exhibit 12), this is not a case where there was material dispute about Plaintiffs job description; the City has not sought to inflate the parameters of her responsibilities for purposes of First Amendment analysis. See Garcetti, 547 U.S. at 424 (“the proper inquiry is a practical one .. . the listing of a given task ... is neither necessary nor sufficient”); Fritz v. Daly, 2006 WL 3095755 (D.N.H. 2006) (unpublished), at *5 (court “must examine the ‘content, form and context’ ... to determine official duties”). Again, the parties stipulated to Trial Exhibits 1-3, which set out the structure of City government as it applied to Ms. Mullaney’s employment.
The Executive Director of Elder Affairs “shall be appointed by, and shall serve at the pleasure of, the city manager.” Trial Exhibit 1, Article 16, at section 3(e).[8] Further,
The executive director of the department shall, under the general superintendence of the commission [on Elder Affairs] and the city manager, be responsible for the following:
(1) serve as the administrative agent and clerk of the commission;
(2) administer the department;
(3) perform such duties as the commission or the city manager may direct;
and
(1) (sic) execute on behalf of the department any contract, lease or any other legal document
Trial Exhibit 1, Article 16 at section 7.
The City Manager is appointed by the City Council as “the chief administrative and executive officer of the city responsible for the administration of all city agencies,” and “shall be responsible to the city council.” Trial Exhibit 2, Article Three, Sections 3-1 and 3-2. Department heads “may be removed by the city manager.” Id., at Section 3-3(a). The Commission on Elder Affairs was part of the Department, a fifteen-member Board of volunteers appointed by the City Manager to three-year terms. Trial Exhibit 1, Article 16, at Section 3(a) and (b).
Pursuant to this constellation of authority, Mr. Hoover issued to Ms. Mullaney a detailed written “Reprimand,” dated September 28, 2001, resulting in a three-day suspension without pay (Trial Exhibit 4), and an equally detailed written “Reassignment of position and duties,” dated March 19, 2001, which resulted in her demotion from the cabinet to a different department, and a reduction of approximately $10,000 in annual pay. Trial Exhibit 6. It is undisputed that among the reasons detailed, either directly or indirectly, in this written progressive discipline are the three purported examples of free speech addressed below. Id.; Mullaney Trial Testimony; Hoover Trial Testimony.

Legal Standard

The original dogma was that public employees had no speech rights. Connick v. Myers, 461 U.S. 138, 143 (1983). That dogma was “qualified in important respects” by a series of Supreme Court rulings which attempted to protect “a public employee’s right, in certain circumstances, to speak as a citizen addressing matters of public concern.” Garcetti, 547 U.S. at 417. Nonetheless, a government entity retains significant discretion to restrict speech when it acts in its role as employer, and the speech has some potential to effect the agency’s operations. Id. at 418, citing Pickering v. Board of Educ. of Township High School 391 U.S. 563 (1968). Garcettt, in its turn, “clarified and expanded on the earlier law,” by directly addressing the question of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee’s official duties. Curran v. Cousins, 509 F.3d 36, 44-45 (1st 2007).
As Garcetti progeny in the lower federal courts have consistently found, the Supreme Court described the correct analysis to be a two-step initial inquiry. The first step requires a determination of whether the employee spoke as a private citizen, on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on her employer’s reaction to the speech. Only if the answer is yes does the question of the government entity’s response, and the adequacy of its justification, become relevant. Garcetti, 547 U.S. at 418. Depending on the answer to that second inquiry, the fact finder may reach causation. Curran, 509 F.3d at 45. On the question of causation, the employer always has the opportunity to prove that it would have made the same decision regardless of the protected expression. Mt *38 Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).
While it is the judge who decides as a matter of law the issues in the two steps Garceta identifies, Cousins, 509 F.3d at 45, the first analytical step itself plainly consists of two separate prongs: the capacity of the speaker, and the subject matter of the speech. Garceta did not reach or analyze the “public concern” prong as it had in prior cases,[9] because the Court held that “the controlling factor in Ceballos’ case is that his expressions were made pursuant to his duties as a calendar deputy [district attorney]” as part of what he as employed to do ... Restricting speech that owes its existence to a public employee’s professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421-22.[10] ‘The fact that his duties sometimes required him to speak or write does not mean his superiors were prohibited from evaluating his performance ” Id. at 422. See also Richards v. City of Lowell, 472 F.Supp.2d 51, 79 (D.Mass. 2007) (only question before the court is whether employee’s speech was made pursuant to employment duties, or outside the scope of his employment as a private citizen);. Conservation Comm’n of the Town of Westport v. Beulieu, 2008 WL 4373761 at *4 (D.Mass. 2008) (“The Court, in effect, carved out a First Amendment exception for work-related speech”). So too here, the court does not reach the issue of public concern.
On a motion for directed verdict, the court conducts this Garceta analysis on the trial evidence before it, viewed in the light most favorable to the Plaintiff. That is, the court considers “whether, anywhere in the evidence from whatever source derived, any combination of circumstances could be found from which a reasonable inference [of protected private citizen speech] could be drawn in favor the plaintiff.” Uno Rests. v. Boston Kenmore Realty Corp., 441 Mass. 376, 382; Freeman v. Planning Board of West Boylston, 419 Mass. 548, 550 (1995); Raunela v. Hertz Corp., 361 Mass. 341, 343 (1972); Ravoza v. Zais, 40 Mass.App.Ct. 47, 48 (1996).
Analysis of Claimed Protected Speech/ Count 1[11]
In her First Amended Complaint, throughout trial, and during the hearing on Defendants’ Motion, Plaintiff consistently stated that her First Amendment claim was based on three specifically identified examples of speech or expression, as follows:
(1) her draft of a letter to the Board of Directors of the Age Center of Worcester Area, dated August 27, 2001, printed on Executive Office of Elder Affairs letterhead and over the signature of the Worcester Commission on Elder Affairs (Trial Exhibit 14);
(2) her note to “Staff’ commenting on the Ciiy of Worcester State Legislative Prioritized List-Top 10 (Trial Exhibit 5); and
(3) her advice to a group of elders who brought to a meeting of the Commission on Elder Affairs a petition for additional space to accommodate another pool table at the Senior Center. Ms. Mullaney suggested at that Commission meeting the gentlemen bring their petition to an upcoming public meeting of the City Council’s Elder Affairs Subcommittee.
Pursuant to Garcettijurisprudence, the court analyzes each of these purported utterances in turn to determine, based on the content, form and context of the entire record, whether any of them constitutes protected private citizen speech, or whether each is the unprotected speech of a government employee carrying out her official duties.

Exhibit 14

It is undisputed Plaintiff was the clerk and agent of the Commission on Elder Affairs, and that she considered herself “staff’ to them. Mullaney Trial Testimony; Hoover Trial Testimony; Exhibit 1. Whether the Commission requested the draft from her, or she volunteered to create it (Plaintiff testified to both versions) is immaterial to this analysis. There is no dispute that all of the draft language is hers, and thus arguably her “speech,” on the admittedly topical and sensitive matter of the relationship between the agencies referenced. Likewise, there is no dispute that: Mr. Hoover disapproved of the draft language, considering it “too emotional and inflammatory” (Plaintiffs Trial Testimony; Defendant’s Testimony; Trial Exhibit 4, at paragraph 1); Mr. Hoover told Ms. Mullaney not to send the letter (id.); and while a substantive discussion of the draft was held at the Commission on Elder Affairs meeting on August 27, 2001, and the letter was signed by the Commission members, it was not sent to the Board of Directors of the Age Center. Id. and Trial Exhibit 10.
Thus the only question about this proffered speech is a legal one: was Ms. Mullaney drafting this letter and participating in the discussion at the meeting as aprivate citizen, or in her capacity as the clerk and agent of the Commission. The court finds it indisputable that both the drafting and the participation in the meeting fell quite reasonably and comfortably within the four comers of Ms. Mullaney’s job description, that she was acting in her official capacity as a senior level government official, and that no rational trier of fact could find otherwise. Thus this example of speech was unprotected as a matter of federal law, and Defendants’ Motion must be granted with respect to it.

Exhibit 5

The foundational facts with respect to Exhibit 5 are likewise undisputed. Exhibit 5 is a copy of the first page of a multi-page document setting out Mr. Hoover’s legislative priorities on behalf of the City. When Ms. Mullaney received Exhibit 5 from her boss, she dated it by her hand 2/14/02, and wrote by hand the following comment which appears at the bottom of the page: “Staff — FYI City Mngr. didn’t give elders/EOEA a high priority We are #37 & #38 out of a 41 item list. Ely” (emphasis in original). Whether she gave the note to “two or three” staff members, “about five,” or “something less than half of all [12]” of her staff — Plaintiffs testimony on *39 this point varied — is immaterial for purposes of First Amendment analysis. Plaintiff was the supervisor of approximately twelve more junior municipal employees, she was a member of the City Manager’s cabinet, and she was communicating her “disappointment, frustration, commiseration” to those staff members. She believed the prioritized list conflicted with prior statements by Mr. Hoover to the effect that the Department of Elder Affairs was a priority, and she wanted her staff to know that. Mullaney Trial Testimony. Mr. Hoover, in contrast, took the position that: ‘Your communication style with staff regarding my decisions continues to be inappropriate (e.g. Attachment— 2/14/02 hand-written note regarding city manager priorities).” Trial Exhibit 6, Communications /Relations, at item 1; Hoover Trial Testimony.
Notably Ms. Mullaney distributed her comment to no one else but her Elder Affairs staff. For example, there was no evidence she shared it with other advocacy agencies, with constituents at the Senior Center,[12] or with the media. It was a regular part of Ms. Mullaney’s job to communicate City Manager directives to her staff and generally to lead that staff on the work of the City on behalf of elders. See generally Trial Exhibit 3. I therefore find this example of speech was made by Ms. Mullaney in the context of her official duties doing the job she was paid to do, and not as a private citizen of Worcester speaking out on the proper allocation of the City’s resources. Thus this example of speech is unprotected as a matter of law, and Defendants’ Motion must be granted with respect to it.[13]

Petitioning the City Council

This final proffer of protected speech is not so clearly embodied in a document, although it is alluded to in more than one, and again the foundational facts are undisputed in the trial testimony of Ms. Mullaney and Mr. Hoover. A small group of gentlemen elders who enjoyed playing pool at the Senior Center wanted space for a second pool table to be located there. The City Manager believed such a request would require more physical space, and thus a significant dedication of City time and resources to investigate and accomplish. Nonetheless, these gentlemen drafted a written petition (not in evidence) addressed to each of the Mayor, the City Manager and the City Counsel. They brought their petition to a meeting of the Commission on Elder Affairs, and sought advice from those assembled as to how best to present their case. At that Commission meeting, Ms. Mullaney advised the gentlemen to mail or hand carry their petition to the City Manager and to the Mayor. She further advised them that they might best present their petition to the City Council at an upcoming public meeting of the Council’s Elder Affairs Subcommittee.
This third example is a bit more nuanced for Garcetti purposes. The constituents obviously possessed their own independent First Amendment rights to petition their elected officials. Many people, inside or outside City government, could well have offered the same advice Ms. Mullaney did. Alternatively, it might be argued that on its face the advice Ms. Mullaney offered wasn’t really “speech” at all. Yet, in assessing the full context of the incident, in light of the undisputed facts about the historical evolution of the Senior Center, it is clear Ms. Mullaney favored the elders’ request, and felt it to be part of her official “advocacy” role to encourage them to petition directly. Mullaney Trial Testimony; Trial Exhibit 1, Article 16 at section 2 (“advocating on behalf of elders” included in functions of Department). Mr. Hoover, in contrast, thought it inappropriate for one of his cabinet members to offer this direct advocacy, on what he considered a sensitive and complicated financial topic for the City, without first alerting him to the issue, and considering alternative methods for addressing it. Hoover Trial Testimony. The parties agree this “pool table space” question is one example of the types of surprises Mr. Hoover stated (repeatedly, on the job and at trial) he did not want to receive from his senior staff, and it is referenced as one basis for Ms. Mullaney’s reassignment. See Trial Exhibit 6, at page 1, “Communication/Relations” at item 2: “Lack of adherence to administrative protocols (e.g. submission of reports/information to me for decision making and advising that clients approach city council)”; Mul-laney Trial Testimony; Hoover Trial Testimony.
I find Ms. Mullaney’s advice to elder constituents in the context of a meeting of the Commission on Elder Affairs was spoken in her dual capacity as a member of the City Manager’s cabinet and as staff to the Commission. Both capacities lie clearly within the undisputed letter and spirit of her official duties as Executive Director. See Trial Exhibit 1 at section 7, and Trial Exhibit 3 at section 12(i). I thus rule this incident of expression was not protected as private citizen speech pursuant to the First Amendment, and Defendants’ Motion must be allowed as to this example as well.

Intentional Infliction of Emotional Distress/Count E

Defendants also moved for a directed verdict on Count II, pleaded as the state tort of intentional infliction of emotional distress. Although the count is pleaded as if against both Defendants, the law is quite clear that the Ciiy of Worcester, as an employer participant in the state workers’ compensation program, cannot be sued by an employee for personal injuries allegedly incurred in the course of her employment. G.L.c. 152, section 24. This tort does not fall within any of the limited exceptions to the statutory bar, and thus there has never been any possibility that Plaintiff could state a claim against the City in Count II. The court nonetheless heard Plaintiffs evidence with respect to individual Defendant Hoover in the event any proof might be offered that supervisor Hoover was not acting within the course of his employment and in furtherance of the City’s interest. G.L.c. 152 section 15; Fredette v. Simpson, 440 Mass. 263, 266-68 (2003) (applying the course of employment test); Brown v. Nutter, McClennen & Fish, *40 45 Mass.App.Ct. 212, 214-18 (1998). Having heard absolutely no such factual evidence at trial, and no legal argument in support at the hearing on November 6, 2008, the court ruled Plaintiff could not maintain this state tort claim against her individual supervisor. Defendants’ Motion with respect to Count II was therefore granted, and Count II was dismissed with prejudice.

Conclusion

After hearing three days of evidence together with a jury in this case, the court rules that each of the three examples of speech proffered by Plaintiff — the circumstances surrounding drafting of the letter that is Exhibit 14, the note to staff that is Exhibit 5, and the communication with respect to petitioning the Cily Council — was speech undertaken as a government employee, made pursuant to Plaintiffs official duties as Executive Director of the Executive Department of Elder Affairs, and not the protected speech of a private citizen. Thus Plaintiff has no First Amendment claim based on any reaction by her employer to those utterances. Defendants’ Motion for Directed Verdict on Count I is allowed as a matter of federal law. Defendants’ Motion with respect to Count II is allowed as a matter of state law. The case is dismissed with prejudice.

 The court conducted an extensive final pre-trtal conference in this case, at two separate sessions October 21, 2008, and October 27, 2008. Rulings on pre-trial motions in limine preserved Plaintiffs opportunity to present at trial the complete content, form and context of her speech at work, (Docket, at endorsement of Paper 30), and eliminated concern about wholesale exposure of Plaintiffs mental health records produced by an order of the court during discovery (Docket at Papers 13 and 18, and endorsement of Papers 27 and 28). No portion of these records was ultimately proffered at trial by either side. Instead, Plaintiff testified in general terms to a pre-existing condition and treatment of clinical depression, and her subjective experience of how Defendants’ progressive discipline exacerbated that condition.

 Defendants failed to file a timely dispositive motion. At the first pre-trial conference in June 2008, Defendants moved to file their motion late, and volunteered to file within a matter of days. That motion was allowed, over Plaintiffs strenuous opposition. Docket, at Paper 17. Thereafter, however, neither party filed pleadings in accordance with the court’s order. Another judge of this court (McCann, J.) ruled the summaiy judgment papers untimely, and struck them all from the record. Docket at Paper 23 and endorsement of Paper 24. Defendants moved again at the final pre-trial conference, by way of Rule 16, for reconsideration of Judge McCann’s order, and for leave to re-file their motion. That motion was also denied. The court nonetheless indicated to the parties the legal defense would be preserved pending trial. Docket, endorsement of Paper 25.

 A jury was empaneled because Plaintiffs constitutional claim carried a jury trial right, despite her failure properly to demand same in either of her Complaints. The court earlier ruled in favor of a jury trial, over Defendants’ objection. Docket, at Paper 17.

 See, e.g., Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (“It’s the judge who decides as a matter of law the issues in the two steps Garcetti identifies”); Urofsky v. Gilmore, 26 F.3d 401, 406 (4th Cir. 2000) (“whether speech is that of a private citizen addressing a matter of public concern is a question of lawfor the court”); Charles v. Grief, 522 F.3d 508, 513 n. 17 (5th Cir 2008) (even though analyzing whether Garcetti applies involves the consideration of factual circumstances surrounding the speech at issue, it is a legal conclusion properly decided by summaiy judgment); Davis v. Cook Co., 534 F.3d 650, 653 (7th Cir. 2008) (inquiry into the protected status of speech is one of law, not fact); Brammer v. Twin Peaks, 492 F.3d 1192, 1202-03 (10th Cir. 2007) (the first three Garcetti steps, including whether the employee speaks pursuant to his official duties, are to be resolved by the court): Wilburn v. Robinson, 480 F.3d 1140, 1149 (D.C.Cir. 2007) (first two factors are questions of law for the count to resolve).

 The court has carefully reviewed all of the stipulated Trial Exhibits, but will reference here only those deemed material to its rulings.

 Pursuant to both the directed verdict standard in Massachusetts and Garcetti jurisprudence, the court makes no weight or credibility determinations, but rather relies only on undisputed material facts in evidence for its rulings of law.

 The court notes the bulk of the text in Trial Exhibit 8 consists of “Part 1" comments by Ms. Mullaney herself, and not the ’’Part 2" section, which would reflect Mr. Hoover’s comments. The parties agreed the personnel records were incomplete.

 It is undisputed Ms. Mullany was an employee at will. The case is not about the appeal, effectiveness, or fairness of Mr. Hoover’s management style, and Plaintiff has not pleaded a claim for wrongful discipline or constructive discharge under state law.

 It is often the case that the employee’s chosen topic of speech is arguably a matter of public concern, since much of what a government agency does may well be so. Garcetti, 547 U.S. at 448 (Breyer, J. dissenting).

 The effect of the decision was to reaffirm the District Court’s grant of summaiy judgment in favor of defendants, which had been reversed by the Court of Appeals for the Ninth Circuit.

 The court has previously ruled Plaintiff neither pleaded nor discovered, and thus could not try, an independent municipal liability case against the City, pursuant to Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978). See also Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st Cir. 1989). The City cannot be held liable pursuant to Section 1983 simply because it was Mr. Hoover’s employer. Oklahoma City v. Tuttle, 471 U.S. 808 (1985). Voutour v. Vitale, 761 F.2d 812, 819-20 (1st Cir. 1985), and thus this Count properly proceeded against Mr. Hoover only. Order on Plaintiffs Proffer of Newspaper Articles, November 4, 2008.

 The Senior Center was the centerpiece of much testimony, having been an important function and responsibility of the Department (see Trial Exhibit 1 at sections 2 and 4(i) and (j)) and a longstanding and controversial, albeit relatively successful, City project. The Senior Center should not be confused with the “Age Center,” an independent, non-governmental establishment viewed by some as competition to the Senior Center. Mullaney Trial Testimony; Hoover Trial Testimony.

 The court is not insensitive to the irony that publication within the Department under these circumstances is unprotected, while publication outside the Department, though arguably potentially more disruptive to the effective functioning of City Government, might well be protected. This result is nonetheless compelled by what the Supreme Court described as the “theoretical underpinnings” of the Garcetti rule, and this court is bound by federal law on this federal claim. Garcetti, 547 U.S. at 422-24 (dismissing what the Ninth Circuit referred to as a “doctrinal anomaly”).